UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DION BERGERON *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>LAPORTE COUNTY *et al.*,<br><br>Defendants. | CAUSE NO. 3:23cv1003 DRL |

OPINION AND ORDER

In November 2023, Allen Stevens, Dion Bergeron, and Debra Fly-Nelson, all former LaPorte County employees, collectively brought thirteen claims against LaPorte County and two county commissioners, Richard Mrozinski and Connie Gramarossa, in their personal capacities. Each alleged constitutional claims for retaliation and conspiracy under the First Amendment and certain tortious interference and defamation claims against the commissioners.

Since then, the case has become narrower. Last summer, the court dismissed all claims and parties, except Mr. Bergeron's First Amendment retaliation claim under 42 U.S.C. § 1983 against LaPorte County and Commissioner Gramarossa and a state law tortious interference claim against Commissioner Gramarossa. In effect, Mr. Bergeron contends that, after being hired as a seasonal mower in May 2023, he was fired about five weeks later because of his political association and speech against Commissioner Gramarossa. LaPorte County and Commissioner Gramarossa today request summary judgment. With no genuine triable issue on this factual record, the court grants summary judgment.

BACKGROUND

The following facts are established by the summary judgment record, as viewed in the light most favorable to the nonmovant. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 710 (7th Cir. 2017). In May 2023, Allen Stevens, the acting Superintendent of the LaPorte County Highway Department, hired Mr. Bergeron as a seasonal mower. At this time, the LaPorte County Commissioners were Joe Haney, Richard Mrozinski, and Connie Gramarossa. Each department in LaPorte County had a liaison among these three members. The liaison for the LaPorte County Highway Department was Commissioner Gramarossa.

The Bergerons were no strangers to the Board of Commissioners. Mr. Bergeron and his wife, Elizabeth Bergeron, were mainstays in local LaPorte County Republican politics. They were acquaintances of Commissioner Haney and attendees at many of the same events as Commissioner Gramarossa. They were on the same side of the political aisle. The Bergerons regularly rubbed shoulders with other members of the Republican Party, attending monthly meetings of the LaPorte County Republican Party and the 463 GOP Club since 2020.

The Bergerons never held elected office, but Mr. Bergeron ran for Congress in Indiana's District 1 in the 2020 primary election and for State Representative in District 9 in the 2020 and 2022 general elections. During his 2022 election campaign, Commissioner Gramarossa publicly expressed support for him [69-8 at 2]. The only rub was that Ms. Bergeron ran in the 2022 primary election for LaPorte County Commissioner against Commissioner Gramarossa.

Having met Mr. Stevens while running for office, Mr. Bergeron reached out and applied for a seasonal mower position. At the time, Mr. Bergeron lacked a commercial driver's license (CDL), which limited the seasonal jobs he qualified for at the highway department. This particular

mowing position was full-time but seasonal, meaning it would end at the end of the season and Mr. Bergeron would not be eligible for benefits [68 ¶ 12].[1] But no CDL was required. He was hired in May 2023.

The highway department had five seasonal employees who mowed during the summer [*id.* ¶ 29]. Three mowers, including Mr. Bergeron, operated out of LaPorte County, while two others operated out of other districts. The department had between three to five functioning mowers for the county [71 ¶ 30]. As duties, Mr. Bergeron "mowed grass with the mower and then went out on work crews to clear debris, to weed whack the bridges, to clean up" [63-1 Tr. 45]. At his interview, Mr. Bergeron testified that Mr. Stevens also told him about other work he could perform, such as clearing brush along the highway [71 ¶ 33].

Mr. Bergeron worked as a seasonal mower for approximately one month [68 ¶ 19]. During this time, Mr. Bergeron was granted a week of unpaid leave for a surgical procedure [*id.*]. Before taking leave on or about May 31, Mr. Bergeron's mowing machine broke [63-1 Tr. 63]. Without a mower, Mr. Bergeron worked for a few days on the brush crew before his scheduled leave [*id.*].

Around this time, Mr. Bergeron says his professional and political lives collided. Politics, even intra-party, was not without its seeming share of controversy; as involved members in the Republic Party, the Bergerons voiced their opinions. On May 3, 2023, Mr. Bergeron re-posted to his Facebook page an article entitled "Ax Drops on President and County Attorney" [68 ¶ 6; 69-11 at 2]. The article discussed Commissioner Gramarossa's use of a county vehicle to travel to Chicago, Illinois, where she was involved in a car accident [68 ¶ 6].

---

[1] At times, the court cites the pertinent statements of material facts [66, 68, 71] when the parties have indicated that the fact or facts in that particular statement are undisputed. Citations to the record are found within those individual statements.

The next day, Ms. Bergeron attended the LaPorte County Republican Party precinct meeting, where she publicly opposed Commissioner Gramarossa's handling of the Chicago incident and moved to expel the Commissioner from the party [*id.* ¶ 7; 69-6 Tr. 28; 69-5 Tr. 103]. On May 13, Mr. Bergeron shared Commissioner Haney's statement critical of Commissioner Gramarossa's actions on his own Facebook page, including that she had not disclosed to the Board of Commissioners that she had been using a county-owned vehicle in Chicago, that a proposed settlement concerned her negligence, and his belief that she had likely committed felonies from covering up the accident [69-12].

Sometime between May 29 and June 2, 2023, Commissioner Gramarossa visited the highway department headquarters and engaged in a private conversation with Superintendent Stevens [68 ¶ 21; 63-3 Tr. 30]. Standing in the parking lot with Superintendent Stevens, Commissioner Gramarossa gestured toward Mr. Bergeron's truck, stating, "You'll hire this disloyal fucker, but you won't hire my son. I see how you want it to be" [68 ¶ 21; 63-3 Tr. 31]. According to Mr. Bergeron, his truck was easily identifiable because it displayed graphics that advertised his podcast, "Dion's Daily Dose" [71 ¶ 40].

On June 12, 2023, Commissioner Mrozinski told Superintendent Stevens that he was fired from his position with the highway department [68 ¶ 22]. He could only be terminated by the LaPorte County Commissioners [71 ¶ 43]. Commissioner Gramarossa, along with Commissioner Mrozinski, voted in favor of his termination [*id.*]. Immediately after this meeting, Superintendent Stevens went to the highway department headquarters to retrieve his belongings [68 ¶ 22]. He did not return thereafter [*id.*].

After June 12, 2023, albeit for a short time, Andrew Simmermeyer served as the interim superintendent for the highway department [*id.* ¶ 23]. He was initially hired as a seasonal mower, was laid off, then hired back part-time in 2005 before becoming a permanent full-time employee. Before Superintendent Stevens was fired, Mr. Simmermeyer was assistant superintendent, second in command in the highway department, and supervised Mr. Bergeron's daily work out on the road [*id.* ¶ 11]. He was interim superintendent for just a few weeks until Charity Glaser became superintendent around June 22, 2023 [63-2 Tr. 4, 37-38].

Just before she assumed the role, on June 14, Interim Superintendent Simmermeyer called Mr. Bergeron to tell him that he was being let go from his mowing position [71 ¶ 34; 63-1 Tr. 56; 63-2 Tr. 42]. Interim Superintendent Simmermeyer explained that, because his mower was broken, they did not have enough work for him, as he could not perform the primary task for which he was hired [71 ¶ 34]. On the phone call, Mr. Bergeron told Interim Superintendent Simmermeyer he believed his termination was based on political retaliation by Commissioner Gramarossa [*id.*; 63-1 Tr. 56].

Sometime before Interim Superintendent Simmermeyer made the decision to terminate seasonal employees, as at least two others also were let go, he reportedly consulted with Commissioner Gramarossa as the highway department liaison, inquiring about what to do with seasonal workers who no longer had work to do for the highway department [63-2 Tr. 36-37]. Commissioner Gramarossa told Interim Superintendent Simmermeyer that, "[i]f you don't have work for your summer help, let them go" [*id.* Tr. 37]. Interim Superintendent Simmermeyer testified that he did not use any names of employees during this conversation [71 ¶ 44].

Similar mechanical issues plagued the highway department for the rest of the summer, as mowing machines of two additional seasonal workers, Jack Brown and Christopher Fields, also broke down [63-2 Tr. 71-72]. After doing auxiliary work immediately after their vehicles malfunctioned, Mr. Brown was terminated on June 22, 2023, and Mr. Fields was terminated on July 10, 2023 [63-2 Tr. 71]. Interim Superintendent Simmermeyer does not recall the exact nature of the additional work he offered the two mowers, but he usually placed seasonal mowers without a mower on the brush crew and imagined he did the same for Mr. Brown and Mr. Fields [63-2 Tr. 72]. He also does not recall who had the authority to terminate Mr. Brown, whether he did or whether Superintendent Glaser did, but he recalled that Superintendent Glaser terminated Mr. Fields [*id.* Tr. 33], and the termination letter for Mr. Brown confirms that Superintendent Glaser ended his employment too [69-2].

By July, all seasonal mowers in LaPorte County were let go after their mowing vehicles broke down [63-2 Tr. 33, 72]. Regarding Mr. Bergeron in particular, Interim Superintendent Simmermeyer believed Mr. Bergeron told him that he couldn't work in the heat, making it so he could not adequately perform any extra brush cleaning work [71 ¶ 47]. Mr. Bergeron denied ever telling Interim Superintendent Simmermeyer this, claiming he only mentioned that he missed the air conditioning in his mower while brush-cleaning, not that he was unable to work [*id.*].

In November 2023, Mr. Stevens, Mr. Bergeron, and Ms. Fly-Nelson, all at the time former LaPorte County employees, collectively brought thirteen claims against LaPorte County and Commissioners Mrozinski and Gramarossa in their personal capacities. Only Mr. Bergeron's claims for First Amendment retaliation and tortious interference remain for decision today or a jury trial.

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

A. *Preliminary Matters.*

LaPorte County and Commissioner Gramarossa, before replying to the substance of Mr. Bergeron's briefing, raise evidentiary issues. At summary judgment, affidavits must set out facts that would be admissible in evidence, *see* Fed. R. Civ. P. 56(c)(4), and other documents may offer

facts so long as the party can establish that these facts could be presented in a form that would be admissible, *see* Fed. R. Civ. P. 56(c)(1), (c)(2).

"Motions to strike are heavily disfavored, and usually only granted in circumstances [when] the contested evidence causes prejudice to the moving party." *Rodgers v. Gary Cmty. Sch. Corp.*, 167 F. Supp.3d 940, 948 (N.D. Ind. 2016). The court isn't required to strike inadmissible evidence, for the federal rules "allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014). Already at summary judgment, the court carefully reviews both statements of material facts and statements of genuine issues to eliminate from consideration any argument or assertions unsupported by the evidence of record. *See Pack v. Middlebury Comm. Schs.*, 458 F. Supp.3d 1020, 1028 (N.D. Ind. 2020).

First, the defense urges the court to strike certain exhibits from the record. Generally, the court may only consider evidence that would be admissible at trial, but Rule 56(c)(2) explains that (excepting affidavits) a party may only object at summary judgment "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The "form produced at summary judgment need not be admissible." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).

For exhibits, LaPorte County and Commissioner Gramarossa contest the introduction of Mr. Brown's termination letter, signed by Superintendent Glaser and dated June 22, 2023, stating that Mr. Brown was relieved of his services as a seasonal mower because he was idling rather than mowing during work hours. And they object to Mr. Bergeron's inclusion of daily worksheets and fuel reports, recording the hours each worker clocked in and out, where they worked, what they

were doing, and how much fuel they used while doing it. The defense claims that these documents are unauthenticated and inadmissible hearsay.

There is no requirement that documents submitted to oppose summary judgment be fully authenticated, provided the documents could be authenticated and rendered admissible at trial and provided there is no compelling reason for the court to doubt their authenticity at summary judgment. "Merely saying that today they prove to be unauthenticated doesn't meet Rule 56's standard for objecting." *Perez v. Reitz*, 2022 U.S. Dist. LEXIS 177250, 5 (N.D. Ind. Sept. 29, 2022); *see* 11 *Moore's Federal Practice- Civil* § 56.92[3] (3d ed. 1997) ("Based on the language of the amended rule, courts have held that evidence submitted in support of or opposition to summary judgment need not be authenticated."). Yes, best practice would be to tender an affidavit to address authenticity, not least once it has been challenged, *see Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 931 (7th Cir. 2018), but these routine business records have indicia of authenticity, and could be authenticated, quite easily by any trial lawyer. The defense offers no reason why not.

Furthermore, the defense doesn't explain why Mr. Brown's end-of-service letter should be considered inadmissible hearsay. Generally, hearsay is inadmissible, absent some exception. Fed. R. Evid. 802. Statements offered against an opposing party are definitionally not hearsay if made by a party's "employee" about a matter within the scope of employment, as long as the declarant was an employee when he or she made the statement. Fed. R. Evid. 801(d)(2)(D). In cases involving adverse employment actions, an employee need not have been personally involved in the action, but her duties must encompass some responsibility related to "the decisionmaking process affecting the employment action." *Simple v. Walgreen Co.*, 511 F.3d 668, 672 (7th Cir. 2007). Here, it is uncontested that Superintendent Glaser was acting in her

supervisory role for the LaPorte County Highway Department on the date she signed Mr. Brown's end-of-service letter. As superintendent, her duties included hiring and firing of seasonal help, like Mr. Brown. As a result, the letter and the statements within it would qualify as a party-opponent's statement (in effect, the County's statement). *See* Fed. R. Evid. 801(d)(2)(D).

For the other exhibits, LaPorte County and Commissioner Gramarossa never specify which parts of the daily worksheets and fuel reports contain hearsay, or what particular statements concern them. In any event, it would not be surprising that these documents might have multiple avenues to admissibility—as Mr. Bergeron's own statements in part, as statements of the County through employees working within the scope of their employment, and even as business records. *See* Fed. R. Evid. 801(d)(2)(A), 801(d)(2)(D), 803(6). The court overrules the defense's objections to these records and their consideration on summary judgment.

LaPorte County and Commissioner Gramarossa next object to certain reiterated statements that they call hearsay. There are two sets of statements. First, Mr. Stevens testified in deposition that Commissioner Haney told Mr. Stevens, after his departure as superintendent, that Mr. Bergeron's mower was broken and that the highway department could not answer why Mr. Bergeron wasn't put on a backup mower, though Mr. Stevens explained that he was unaware whether the other mowers were assigned to and in use by other individuals [63-3 Tr. 48-49]. The parties agree that Mr. Bergeron's mower was broken, so this portion of the statement, even if hearsay at any level of exchange, would not be prejudicial to anyone.

The thornier question concerns the highway department's seeming silence, and Commissioner Haney's interpretation of this and his statement to Mr. Stevens. Mere passive silence would not be a statement subject to hearsay considerations, absent some nonverbal

conduct that would intend the silence as an assertion or some adoptive admission. Fed. R. Evid. 801(a), (d)(2)(B); *see, e.g., United States v. Ward*, 377 F.3d 671, 675-76 (7th Cir. 2004). The court has not been given a record, or even an inkling of one by either side, to suggest some unknown person at the highway department intended to make an assertion, much less what Commissioner Haney said that could be construed as the unknown person's adoptive admission on the highway department's behalf. From there, no one presents a basis for classifying Commissioner Haney's statement to Mr. Stevens as non-hearsay (it cannot be clear that Commissioner Haney was speaking within the scope of his relationship with the County in talking then with a civilian) or for excusing Mr. Bergeron's use of the statement for the truth of the matter. This statement is hearsay, and it reeks of unreliability when so much relies on that first level of interaction with the highway department and the many unknowns there—who was silent or could not explain, what was his or her title or authority to make any representation or to be presumed to have the knowledge to answer the inquiry, what was said, and the like. *See* Fed. R. Evid. 807(a). The court sustains the objection to this portion of Commissioner Haney's statement to Mr. Stevens and will not consider it in deciding this summary judgment motion.

Second, Commissioner Haney reportedly told Mr. Bergeron over the course of two Republican Party meetings in early 2023 that Commissioner Gramarossa made "disparaging comments" about the Bergerons (what exactly no one says), that she promised that neither Mr. Bergeron nor his wife would be appointed to any board in LaPorte County, and that she complained that then-Superintendent Stevens had hired Mr. Bergeron as a seasonal mower that year rather than her son. Mr. Bergeron purports in his declaration to reiterate these statements to him from Commissioner Haney [69-9 ¶ 9-10].

The objection to the last of these three statements is a touch odd, for the defense puts forward the exact statement from Commissioner Gramarossa to then-Superintendent Stevens to this effect in its statement of facts [68 ¶ 21]. That somehow this statement got relayed from then-Superintendent Stevens to Commissioner Haney, and then from Commissioner Haney to Mr. Bergeron, or that they repeat it, offers nothing material to support or oppose summary judgment. Of course, the defense could be right that these next two levels of declaration might be hearsay, without more by way of foundation, but there is a reasonable likelihood that a foundation could be laid to treat these communications as made within a representative capacity for the County at the time. Because the two sides effectively cite the same core evidence—the statement by Commissioner Gramarossa to then-Superintendent Stevens—the court considers this statement, deeming the rest of the reiterations moot because they are not material facts.

The other two statements—nesting "hearsay" from Commissioner Gramarossa to Commissioner Haney, and then from Commissioner Haney to Mr. Bergeron—require a different analysis. An affidavit must set out facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4). At neither level has Mr. Bergeron established a basis for treating these statements as non-hearsay or for an exception to hearsay. He says they should be imputed to the County as its statement as a party. Whether that might be true for Commissioner Gramarossa's statements to Commissioner Haney (not having any context for when or how the statements were made), or whether that level might actually enjoy an exception as it relates to Commissioner Gramarossa's state of mind, Fed. R. Evid. 803(3), it cannot be said that Commissioner Haney's repetition of these statements at a 463 Club meeting—a social or political club—occurred within the scope of his relationship with the County (or that the County otherwise authorized or adopted the

statement), Fed. R. Evid. 801(d)(2). In fairness, no one seems to contest that Commissioner Gramarossa had an axe to grind; on the other hand, in terms of prejudice, Mr. Bergeron has not established the materiality of these statements as it concerns the actual decisionmaker in his termination or how Commissioner Gramarossa's mindset infected that decisionmaker. And whether she had every intention to block Mr. Bergeron from a county board says little about whether a different person had a legitimate or retaliatory reason to terminate his employment.

B. *First Amendment Retaliation.*

Mr. Bergeron claims that the defendants retaliated against him for engaging in speech protected by the First Amendment. To succeed, he must adduce evidence from which a jury could reasonably find that "(1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor in the employer's action." *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir. 2006) (cleaned up); *see Sweet v. Bargersville*, 18 F.4th 273, 277-78 (7th Cir. 2021). LaPorte County and Commissioner Gramarossa acknowledge that Mr. Bergeron engaged in protected speech by criticizing Commissioner Gramarossa on social media and at Republican Party meetings. They also acknowledge that he suffered an adverse employment action by being terminated. They focus their argument on causation instead.

"At summary judgment in First Amendment retaliation cases, the burden of proof for causation is divided and shifts between the parties." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017) (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)). "First, the plaintiff must produce evidence that his speech was at least a motivating factor . . . [in] . . . the employer's decision to take retaliatory action against him." *Id.* (citations omitted); *see Mt. Healthy*

*City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013). "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Massey,* 457 F.3d at 717 (quoting *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004)). If he makes this threshold showing, the burden shifts to the defendants to produce evidence showing that they would have made the same decision even absent the protected speech. *Minocqua Brewing Co. v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025). If unsuccessful, the law deems the plaintiff's speech not just the motivating condition but the necessary condition for his adverse employment action. *See Mays*, 719 F.3d at 634; *Kidwell*, 679 F.3d at 964-65; *see also Lozman v. City of Riviera Beach*, 585 U.S. 87, 96 (2018).

Mr. Bergeron may establish that his speech was a motivating factor in the decision to terminate his employment through direct or circumstantial evidence. "Direct evidence is evidence [that], if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005) (quotations and citation omitted). Circumstantial evidence is evidence from which a factfinder may infer that retaliation occurred. *See id.* at 720-21. "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009) (cleaned up); *see Massey*, 457 F.3d at 717.

Mr. Bergeron claims that the undisputed confrontation between Commissioner Gramarossa and Mr. Stevens, in which she called Mr. Bergeron a "disloyal fucker" and arguably criticized Mr. Stevens for hiring Mr. Bergeron (rather than her son), serves as direct evidence of Commissioner Gramarossa's animus towards Mr. Bergeron—all, as the theory goes, motivated

by his "disloyal" speech. But Commissioner Gramarossa directed her disapproving comments to Mr. Stevens, not to Interim Superintendent Simmermeyer, the decisionmaker who actually fired Mr. Bergeron.

Mr. Bergeron theorizes that Interim Superintendent Simmermeyer was influenced by Commissioner Gramarossa under a "cat's paw" theory.[2] Under this theory, "if a supervisor performs an act motivated by [discriminatory or retaliatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). It is proper to impute discriminatory or retaliatory animus to a decisionmaker when the "party nominally responsible for a decision is, by virtue of [his] role in the [county], totally dependent on another employee to supply the information on which to base that decision." *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 918 (7th Cir. 2007). Mr. Bergeron must offer evidence that a "non-decision-making employee with [retaliatory] animus provided factual information or input that may have affected the adverse employment action." *Miller v. Polaris Lab'ys, LLC*, 797 F.3d 486, 490 (7th Cir. 2015) (quoting *Matthews v. Waukesha Cnty.,* 759 F.3d 821, 829 (7th Cir. 2014)). In short, this theory presumes that the actual decisionmaker was used as an "unknowing tool" by another person's retaliatory animus. *Id.*

Here the record runs cold. Mr. Bergeron adduces no evidence that Interim Superintendent Simmermeyer, the interim highway department superintendent who terminated him, knew of this

[2] The term "cat's paw" derives from Aesop's fable, put into verse by Jean de La Fontaine in 1679, and injected into employment discrimination law by Judge Richard Posner. *See Shager* v. *Upjohn Co.*, 913 F. 2d 398, 405 (7th Cir. 1990). In the fable, a monkey convinces a cat by flattery and deception to grab a roasting chestnut from the fire. After the cat has done so, burning its paws in the process, the devious monkey makes off with the chestnuts and leaves the cat empty-handed.

conversation between Commissioner Gramarossa and Mr. Stevens or that Mr. Stevens communicated this interaction to his successor. No evidence would permit a reasonable jury to find that Commissioner Gramarossa influenced Interim Superintendent Simmermeyer to act out of animus, or that he was totally dependent on her input in making his termination decision. In fact, the record shows that Interim Superintendent Simmermeyer was personally familiar with Mr. Bergeron's work and the amount of work available for seasonal workers. He had the authority to hire and fire seasonal mowers. Even crediting the fact that Interim Superintendent Simmermeyer discussed seasonal help with Commissioner Gramarossa—"[i]f you don't have work for your summer help, let them go" [63-2 Tr. 21]—this advice still left to Interim Superintendent Simmermeyer the determination whether he had enough work for seasonal help and whether to let them go. No reasonable jury could call this undue pressure or influence that left Interim Superintendent Simmermeyer with no other choice. He testified that he alone made the decision, and that no one else contributed to it [*id.* Tr. 72]. Without more, Mr. Bergeron cannot claim that Commissioner Gramarossa's conversation with a predecessor superintendent motivated Interim Superintendent Simmermeyer's decision, or that her animus infected his decision such to call it a motivating factor, or that Commissioner Gramarossa so selected, colored, and supplied the information to Interim Superintendent Simmermeyer that she was the functional decisionmaker or that he was merely a natural extension of her.

This result remains indisputable even when a jury would hear certain circumstantial evidence from Mr. Bergeron. He endeavors to piece together a patchwork of suspicious timing, pretextual explanations, and disparate treatment to create a genuine triable issue. *See, e.g., Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 782 (7th Cir. 2007).

Mr. Bergeron argues suspicious timing between his public statements against Commissioner Gramarossa and his termination. Suspicious timing exists when an adverse employment action closely follows protected activity, *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015), but it must be "so close on the heels" that an inference of causation is sensible, *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011). Suspicious timing will "rarely be sufficient in and of itself to create a triable issue." *Culver v. Gorman & Co.,* 416 F.3d 540, 546 (7th Cir. 2005) (quoting *Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir. 2002)). The reason is fairly intuitive, for "[s]uspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Loudermilk*, 636 F.3d at 315 (quotations omitted).

Mr. Bergeron posted a public statement critical of Commissioner Gramarossa on May 3, 2023.[3] He shared a Facebook post from Commissioner Haney criticizing Commissioner Gramarossa's handling of the Chicago crash of a county vehicle on May 13, 2023. Mr. Bergeron was terminated on June 14, 2023. He cites no cases in which a decision over four weeks later (32 days) was alone sufficiently close to be suspicious, a designation courts typically reserve for shorter time periods. *Compare Kidwell*, 679 F.3d at 966-67 (holding five-week lapse too long to base retaliation solely on suspicious timing because "[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action"), *with Casna v. City of Loves Park*,

[3] Ms. Bergeron voiced public criticism of Commissioner Gramarossa and attempted to have her expelled from the party the next day at the LaPorte County Republican Party precinct meeting [68 ¶ 39], but the law on First Amendment retaliation focuses on the employee's speech.

574 F.3d 420, 427 (7th Cir. 2009) (same day), *and McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir. 1997) (one day, two to three days, or one week can be enough).[4] In any event, "temporal proximity alone is rarely sufficient to establish causation." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) (quotation omitted); *Loudermilk*, 636 F.3d at 315 (propriety of timing inference "depends on context"). This is not a special case where timing alone can carry the day.

Mr. Bergeron urges the court not to view the timing in isolation, but in conjunction with other evidence of supposed shifting, false, or pretextual explanations that Interim Superintendent Simmermeyer gave for Mr. Bergeron's termination. *See Teruggi v. CIT Grp./Cap. Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) ("a party establishes pretext with evidence that the employer's stated reason or the employment decision was a lie—not just an error, oddity, or oversight") (quotations omitted); *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 743-44 (7th Cir. 2011) ("Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action.") (cleaned up). In establishing whether protected speech was a motivating factor in the adverse decision, an "employer's shifting explanations . . . may be evidence that its proffered reason is pretextual." *Sweet v. Town of Bargersville,* 18 F.4th 273, 280 (7th Cir. 2021). Without pretext, even if one were to assume Mr. Bergeron had established that his speech motivated his termination, the defendants could show they would have made the same decision to terminate him for legitimate reasons, even absent his speech, such that his speech

[4] A month, when added to other evidence of retaliatory animus, might help "reinforce an inference of retaliation," though not alone establish that retaliatory animus. *Magyar v. St. Joseph Reg'l. Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008). *Magyar* held that the right timeline there was nine days rather than a month, though it stated the general proposition in considering the possibilities presented by the facts in that case. *Id.* at 772-73.

wasn't a necessary condition. *See Mays*, 719 F.3d at 634; *Kidwell*, 679 F.3d at 964-65; *see also Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 573 (7th Cir. 2021).

Mr. Bergeron attacks Interim Superintendent Simmermeyer's reason for terminating Mr. Bergeron—that his mower broke down—as a shifting explanation. No one truly quibbles with the fact that his mower broke down, but Mr. Bergeron questions the amount of available work in reserve because the county had brush-clearing to do [63-2 Tr. 72]. Mr. Bergeron also notes that, right after his mower broke down, he worked several days on the brush crew.

Just at the start, no reasonable jury could find a shifting explanation when the reason for terminating Mr. Bergeron never changed. Mr. Bergeron claims another mower existed for his use, citing deposition testimony from Mr. Stevens, the former superintendent [63-3 Tr. 48], not Mr. Simmermeyer, the current superintendent; but what a former boss knew to be the circumstances when he was the boss says little about what his successor faced. And in truth, having read it, testimony from neither gentleman establishes that another mower existed for Mr. Bergeron's use, so no reasonable jury could find that this reason was a lie. Indeed, two other seasonal mowers (Jack Brown and Christopher Fields) were also terminated when their mowers went down [63-2 Tr. 71-72]. A department policy, even an informal or unwritten one, can inform the pretext analysis if it is regularly enforced and followed in similar situations, as it was here. *See Osicka v. Sears, Roebuck & Co.*, 886 F. Supp. 1408, 1415 (N.D. Ill. 1995).

In lieu, Mr. Bergeron argues that the county had brush-clearing work for him to do. The court's function is not to sit as some "supreme human resource department" to review an employer's every business decision. *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006) ("The only concern in reviewing an employer's reasons for termination is the honesty of

the employer's beliefs.") (quotations omitted). So long as an employer honestly believed its legitimate reason for taking adverse action against an employee at the time, no liability may be found. *See, e.g., Ransom v. CSC Consulting Inc.*, 217 F.3d 467, 471 (7th Cir. 2000). No reasonable jury could find pretext based on the mere hope of brush-clearing. Even crediting Mr. Bergeron's statement that during his interview he was told that his job duties would also include clearing brush, it is a straightforward inference from the record to conclude that a seasonal mower's primary job was to mow. His mower indisputably went down. Interim Superintendent Simmermeyer testified that he tried Mr. Bergeron on the brush crew for a handful of days, but he recalled that Mr. Bergeron expressed concerns about doing that work in the heat [63-2 Tr. 35]. Mr. Bergeron admits he called the job hot but explains he meant he missed the air conditioning of his mower [63-1 Tr. 65-66]. Even if these two men crossed wires in communicating, nothing on this record permits a reasonable jury to find that Interim Superintendent Simmermeyer lied. He may have misunderstood, but a jury could not find more than that.

Moreover, two other seasonal workers were likewise let go after their mowers broke that summer, albeit one also because he was not mowing on county time and the other for supposedly being unproductive and not being able to perform the substituted work assigned to him after his mower broke down [63-2 Tr. 73-76]. Mr. Bergeron was terminated on June 14, whereas the other two were terminated slightly later that summer. For public employees asserting First Amendment retaliation, a plaintiff may point to evidence of similarly situated employees being treated differently to establish a causal connection between protected activity and adverse employment action. *Kingman v. Frederickson*, 40 F.4th 597, 601 (7th Cir. 2022). Mr. Bergeron sees disparate treatment here, but no reasonable jury could call it that.

Mr. Bergeron has not shown that he was treated materially differently from two other seasonal mowers (Mr. Fields and Mr. Brown), who were both eventually terminated after their mowers broke down. Like the other mowers, Mr. Bergeron was assigned additional work after the county sent his mower off for repairs. Eventually, all three were terminated. From there, any slight differences do not make a case of pretext. Whether brush-clearing work existed a month later, or whether another seasonal mower could tolerate the heat, or whether (as it turns out) they too were not suited to this work, or whether they were terminated for additional reasons, says little about Mr. Bergeron's unique circumstances or the legitimacy of Interim Superintendent Simmermeyer's business decision for the county at that time. And the other two were not terminated by Interim Superintendent Simmermeyer, but by another superintendent. Different employment decisions, concerning different employees, made by different supervisors, seldom work to establish pretext or real disparity in treatment "for the simple reason that different supervisors may exercise their discretion differently." *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000).

For any number of reasons then, Mr. Bergeron has not produced evidence, even when taken collectively, from which a reasonable jury could find that his speech against one commissioner motivated a different person, the interim superintendent, to terminate his employment as a seasonal worker when his mower went down. And the county offers a legitimate business reason for terminating his employment in such a way that his political speech could not be called a necessary condition to his termination—in short, the county would have made the same decision regardless of what Mr. Bergeron said about Commissioner Gramarossa, and no jury could reasonably say otherwise on this record. Mr. Bergeron cannot establish the requisite

causal connection between his speech and his termination, so the court must grant summary judgment for the defense.

C. *Tortious Interference.*

Without a First Amendment claim, all that remains is Mr. Bergeron's tortious interference claim under Indiana common law. The court must decide whether to exercise supplemental jurisdiction over it. The court may decline. *See* 28 U.S.C. § 1367(c)(3) (if "the district court has dismissed all claims over which it has original jurisdiction," it may decline to exercise supplemental jurisdiction). Typically, when all federal claims are dismissed before trial, there is a presumption that jurisdiction over the pendent state law claims will be relinquished. *Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010).

Certain exceptions may displace this presumption: "when (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Sharp Elecs. Corp. v. Metro. Life Ins.*, 578 F.3d 505, 514-15 (7th Cir. 2009) (quotations omitted). Before declining to exercise supplemental jurisdiction, the court also considers judicial economy, convenience, fairness, and comity. *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172-73 (1997); *Rongere v. City of Rockford*, 99 F.4th 1095, 1106 (7th Cir. 2024).

Here, it is "absolutely clear" how the tortious interference claim should be decided. Mr. Bergeron claims that Commissioner Gramarossa tortiously interfered with his business relationship with the county by leveraging her authority to direct Interim Superintendent Simmermeyer to fire him. Tortious interference with a business relationship requires proof of

"(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *McCollough v. Noblesville Schs.*, 63 N.E.3d 334, 344 (Ind. Ct. App. 2016). "[T]his tort requires some independent illegal action." *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.,* 796 N.E.2d 286, 291 (Ind. 2003). As independent illegal action, Mr. Bergeron posits only First Amendment retaliation; but, because he cannot prove that to a reasonable jury, he likewise cannot prove his tortious interference claim to that jury. *See Wright v. Associated Ins.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("If the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim, there is no use leaving the latter to the state court."). The court thus grants summary judgment for the defense.

CONCLUSION

For these reasons, the court GRANTS the summary judgment motion [64], DIRECTS the clerk to enter judgment for LaPorte County and Commissioner Gramarossa, and VACATES the final pretrial conference and trial date. This order terminates the case.

SO ORDERED.

October 15, 2026

*s/ Damon R. Leichty*
Judge, United States District Court